UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


MALCOLM ARMSTRONG                              CIVIL ACTION

VERSUS                                         NO. 10-1647

RITE AID ET AL.                                MAGISTRATE JUDGE
                                               JOSEPH C. WILKINSON, JR.


**ORDER AND REASONS ON MOTIONS**

This is an employment discrimination case brought by plaintiff, Malcolm Armstrong, against his former employer, K & B Louisiana Corporation d/b/a Rite Aid and Rite Aid HDQTRS Corp. (collectively "Rite Aid").  Armstrong alleged in his complaint that he was subjected to racial and retaliatory harassment and to retaliatory termination of his employment.  Complaint, Record Doc. No. 1.

This matter was referred to a United States Magistrate Judge for all proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c) upon written consent of all parties.  Record Doc. No. 14.

Rite Aid filed a motion for summary judgment, supported by voluminous exhibits, including the complete transcript of plaintiff's deposition and several declarations under penalty of perjury.  Record Doc. No. 31.  Defendant argues that Armstrong cannot establish a prima facie case of racial or retaliatory harassment or retaliatory discharge. Rite Aid also contends that, even if Armstrong could make out a prima facie case of retaliatory termination, he has no evidence of any causal connection between his

allegedly protected conduct and his termination, and no evidence to rebut defendant's proffered legitimate, nonretaliatory reasons for terminating him.

Plaintiff filed a timely opposition memorandum, in which he abandons his racial and retaliatory harassment claims. Record Doc. No. 54 at p.1, n. 1. He argues, however, that he has sufficient evidence to create genuine issues of disputed material fact as to his remaining claim of retaliatory discharge. He received leave to substitute his signed, sworn declaration in place of the unsigned one he originally filed, along with excerpts of deposition transcripts that he had quoted in, but not attached to, his opposition memorandum. Record Doc. Nos. 57, 58.

In accordance with the court's previous order, Record Doc. No. 45, defendant filed a timely reply memorandum. Record Doc. No. 59. Defendant included new exhibits with its reply memorandum. If I were to consider the new exhibits, I would be compelled to grant plaintiff an opportunity to respond to them. However, because the new exhibits are unnecessary to resolution of defendant's pending summary judgment motion, I have not considered them.

Also pending before me is plaintiff's "Motion to Reconsider Parts of Order of 6/1/11." Record Doc. No. 48. Armstrong seeks reconsideration of my order, Record Doc. No. 45, denying his motion to extend the discovery deadline so that he can obtain recent disciplinary information from the personnel file of his former supervisor, Tammy Rogers, and for leave to re-depose Rogers after he reviews the recent information.

Rite Aid filed a timely memorandum in opposition to plaintiff's motion.  Record Doc. No. 53.  I ordered defendant to submit to the court for in camera review the written discipline reports and other documents related to Rogers's recent employment status change.  Record Doc. No. 51. In addition to complying with that order, Rite Aid states in its opposition memorandum that it has provided the same documents to plaintiff's counsel.

I.      PLAINTIFF'S MOTION TO RECONSIDER

The discovery deadline in this case was already extended once at plaintiff's request.  Record Doc. No. 29.  After the deadline expired, I denied Armstrong's motion to amend the scheduling order to extend the deadline a second time so that he could obtain recent documents from Rogers's personnel file and depose her again, if he deemed it necessary after viewing the documents.  Record Doc. No. 45.  Plaintiff moved for reconsideration of that order, requesting that I review the recent documents in camera in hopes that my review might change my prior ruling.  Defendant opposes the motion.

Having considered the submissions of the parties and having reviewed the materials from Rogers's personnel file that were submitted in camera, IT IS ORDERED that plaintiff's motion to reconsider is DENIED.

Armstrong must demonstrate "good cause" to amend the court's Rule 16 scheduling order. Fed. R. Civ. P. 16(b)(4).[1] In determining "good cause" in connection with a Rule 16 scheduling order of the type that was entered in this case, the court must weigh the following factors: (1) the explanation for the failure to comply, (2) the importance of the matters that are the subject of the order, (3) potential prejudice in allowing the requested action and (4) the availability of a continuance to cure such prejudice. Nunez v. U.S. Postal Serv., 298 F. App'x 316, 319 (5th Cir. 2008) (citing Metro Ford Truck Sales, Inc. v. Ford Motor Co., 145 F.3d 320, 324 (5th Cir. 1998)); Hamburger v. State Farm Mut. Auto. Ins. Co., 361 F.3d 875, 883 (5th Cir. 2004) (citing Geiserman v. MacDonald, 893 F.2d 787, 791 (5th Cir. 1990)).

Information about events that occurred after the allegedly discriminatory or retaliatory act is not per se irrelevant. The determination of relevance "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 388 (2008).

---

[1]Because plaintiff cannot meet even the good cause standard of Rule 16(b), I do not consider at length whether he can satisfy the more stringent standard of Fed. R. Civ. P. 59(e) for a motion to alter or amend my prior ruling, which is the proper procedural rule for a so-called motion to reconsider. A Rule 59(e) motion may be granted on four grounds: (1) to correct manifest errors of law or fact upon which a judgment is based, (2) the availability of new evidence, (3) the need to prevent manifest injustice, or (4) an intervening change in controlling law. The Rule 59(e) standard "favors denial of motions to alter or amend a judgment." In re Katrina Canal Breaches Consol. Litig., No. 05-4182, 2009 WL 2447846, at *2 (E.D. La. Aug. 6, 2009) (Duval, J.) (quotations omitted); accord McGillivray v. Countrywide Home Loans, Inc., 360 F. App'x 533, 537 (5th Cir. 2010). Suffice it to say that plaintiff has made no showing that any of these grounds exists in this case.

"The relevance of post-termination evidence in a Title VII case depends on the nature of the evidence, the purpose for which it is offered, and the context in which it arises.  In some circumstances, post-termination data is relevant to the employer's state of mind before termination."  Bowie v. Maddox, No. 08-5111, 2011 WL 2451018, at *8 (D.C. Cir. June 21, 2011) (citations omitted); accord Southard v. Tex. Bd. of Crim. Justice, 159 F.3d 1356, 1998 WL 698995, at *1 (5th Cir. 1998); L'Etoile v. New England Finish Sys., Inc., 575 F. Supp. 2d 331, 335 & n.3 (D.N.H. 2008) (citing Sprint/United Mgmt. Co., 552 U.S. at 381; Ansell v. Green Acres Contracting Co., 347 F.3d 515, 523-24 (3d Cir. 2003); Brown v. Trustees of Boston Univ., 891 F.2d 337, 350 (1st Cir. 1989); Elion v. Jackson, 544 F. Supp. 2d 1, 8-10 (D.D.C. 2008)).

> A court should consider the passage of time between the other act and the act alleged to be discriminatory.  There is a point at which a prior or subsequent act becomes so remote in time from the alleged discriminatory act at issue, that the former cannot, as a matter of law, be relevant to intent.

Ansell, 347 F.3d at 524 (citation omitted).

> There is, however, no bright line rule for determining when evidence is too remote to be relevant. . . .  Any such determination must be based on the potential the evidence has for giving rise to reasonable inferences of fact which are "of consequence to the determination of the action," Fed. R. Evid. 401, and will not be disturbed on appeal unless it amounts to an abuse of discretion.

Id. at 525 (citations omitted).

Upon careful consideration of the materials submitted for in camera review, I find that the documents and the recent change in Rogers's employment status provide no

5

insight into and permit no inference about Rite Aid's reasons for firing Armstrong nearly two years earlier, and do not provide good cause to amend the scheduling order. They address Rogers's overall management performance and have nothing to do with the essential elements of plaintiff's sole remaining claim. In short, they are immaterial to disposition of this matter. As I have previously stated, plaintiff has had ample time to conduct full discovery. He has taken a full complement of depositions and submitted several rounds of interrogatories and requests for production. His proposed re-deposition of Rogers is unimportant because it would address recent events that occurred long after his termination and are irrelevant to his allegations of retaliatory discharge. Although a continuance of the trial date has already been granted, defendant would be prejudiced by allowing additional discovery into irrelevant matters that would delay a decision on its pending summary judgment motion. Accordingly, plaintiff has not shown good cause to extend the discovery deadline again.

II.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Having considered the complaint, the record, the submissions of the parties and the applicable law, and for the following reasons, IT IS ORDERED that defendant's motion for summary judgment is GRANTED.

A.    <u>Standards of Review</u>

"A party may move for summary judgment, identifying each claim or defense–or

the part of each claim or defense–on which summary judgment is sought.  The court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  Rule 56 was revised to "take effect on December 1, 2010, and shall govern in

all proceedings thereafter commenced and, insofar as just and practicable, all proceedings

then pending."  Order of the Supreme Court of the United States (Apr. 28, 2010),

www.supremecourt.gov/orders/courtorders/frcv10.pdf.    Because "the standard for

granting summary judgment remains unchanged" by the revision, <u>Federal Civil Judicial</u>

<u>Procedure and Rules</u>, 2010 Amendments Advisory Committee Notes, at 260 (West 2011

rev. ed. pamph.) (hereafter "Advisory Committee Notes"), I find it just and practicable

to apply the revised Rule 56 in this proceeding.

Revised Rule 56 establishes new procedures for supporting factual positions:

(1)  A party asserting that a fact cannot be or is genuinely disputed must
support the assertion by:
> (A) citing to particular parts of materials in the record,
> including depositions, documents, electronically stored
> information, affidavits or declarations, stipulations (including
> those made for purposes of the motion only), admissions,
> interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the
> absence or presence of a genuine dispute, or that an adverse
> party cannot produce admissible evidence to support the fact.

(2)  Objection That a Fact Is Not Supported by Admissible Evidence.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3)  Materials Not Cited.  The court need consider only the cited materials, but it may consider other materials in the record.

(4)  Affidavits or Declarations.  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Thus, the moving party bears the initial burden of identifying those materials in the record that it believes demonstrate the absence of a genuinely disputed material fact, but it is not required to negate elements of the nonmoving party's case.  Capitol Indem. Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to [a particular material] fact."  Advisory Committee Notes, at 261.

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  No genuine dispute of material fact exists if a rational trier of fact could not find for the nonmoving party based on the evidence presented.  Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712 (5th Cir. 1994).

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements of its claim.  Id. (citing Celotex, 477 U.S. at 321-23).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."  Celotex, 477 U.S. at 323; accord Capitol Indem. Corp., 452 F.3d at 430.

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."  Edwards v. Your Credit, Inc., 148 F.3d 427, 432 (5th Cir. 1998); accord Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005).  "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."  Badon v. R J R Nabisco Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted) (emphasis in original).  "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'"  Nat'l Ass'n of Gov't Employees, 40 F.3d at 713 (quoting Anderson, 477 U.S. at 249).

"Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the

nonmovant." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation omitted) (emphasis in original); <u>accord</u> <u>Duron v. Albertson's LLC</u>, 560 F.3d 288, 291 (5th Cir. 2009).

 B. <u>Factual Background</u>

 As previously noted, Armstrong has expressly abandoned his racial and retaliatory harassment claims and is proceeding only with his retaliatory discharge claim.  The summary judgment evidence establishes the following undisputed material facts.

 Plaintiff is an African-American man who began working for Rite Aid as a Pharmacy Manager in New Orleans in 1999.  In October 2005, he was promoted to Pharmacy District Manager and transferred to Louisville, Kentucky.  He was then transferred to Rite Aid's southeast region in April 2006, where he oversaw pharmacies in Mississippi.  As a result of this transfer, Armstrong was supervised by Pharmacy Regional Vice President Tammy Rogers, who is Caucasian.

 In February 2008, plaintiff's region was expanded to include pharmacies in Tuscaloosa, Alabama.  In February 2009, Rite Aid rearranged its districts.  Plaintiff no longer supervised the Tuscaloosa area after this redistricting.  He was transferred to Louisiana in March 2009 and was fired on June 12, 2009 for payroll fraud.

 On May 14, 2008, Armstrong met with Rogers and Senior Human Resources Manager Richard Ellison in Mobile, Alabama.  Defendant states that the purpose of the meeting was to discuss plaintiff's job performance, which had slipped from his 2007

overall evaluation of "above expectations" to a current evaluation of "needs development."  Armstrong denies that the purpose of the meeting was to discuss his performance, although he admittedly was told at this meeting that his upcoming annual evaluation would be negative.  He alleges that the purpose of the meeting was to discuss complaints about him that two or three pharmacists in Tuscaloosa had made to Rogers.  Defendant's Exh. A, transcript of plaintiff's deposition, Vol. I at pp. 58, 136-40.  Armstrong stated at this meeting that those few pharmacists did not want to work for an African-American manager.[2]  Defendant's Exh. A, plaintiff's deposition, Vol. I at pp. 66-67, 74-75, 138-40; id. Vol. III at pp. 5, 101.

On May 29, 2008, Armstrong received his annual performance appraisal, in which Rogers gave him an overall rating of "needs development."  Armstrong did not expect a glowing appraisal, as he had received the year before, because his district had suffered a lot of employee turnover in the preceding year and because his "sales numbers were dismal."  Id. Vol. I at pp. 89, 137.  However, he did not believe that his evaluation should have been as negative as it was.  Despite his poor evaluation, he received a raise.

---

[2] Rogers denies that Armstrong ever told her that these particular employees did not want to work for him because of his race, and she states specifically that plaintiff said no such thing at the May 14th meeting.  Defendant's Exh. B, declaration of Tammy Rogers, Record Doc. No. 31-6, at ¶¶ 8-9.  Ellison also declares that plaintiff said nothing at that meeting about any pharmacists not wanting to work for him because he is African-American.  Defendant's Exh. C, declaration of Richard Ellison, Record Doc. No. 31-7, at ¶ 4.  Solely for purposes of the pending motion for summary judgment, the court resolves this fact dispute in favor of plaintiff.

Armstrong sent a letter dated June 26, 2008 to Kandy Grenier in Human Resources, complaining about the performance appraisal that Rogers had given him, and he called Phil Keough, one of Rogers's supervisors, about it. Id. Vol. I, at pp. 82-83. He did not complain in either his phone call to Keough or his letter to Grenier about any racial discrimination or that some employees had difficulty working with him because he is African-American.

As a result of his letter to Grenier, plaintiff agreed to a "360 Evaluation" to provide him with feedback about his performance. Ellison conducted the 360 Evaluation by sending evaluation forms to some of the people who worked with plaintiff.

Before agreeing to the 360 Evaluation, Armstrong expressed concern to Ellison and Rogers that it would not be kept confidential, would become a group activity and would undermine his authority in the district. Id. Vol. I, at p. 97. After the forms were sent out, a pharmacy manager in Tuscaloosa called plaintiff to say that one of her employees had asked for advice about how to fill out the survey.

On April 1, 2009, Armstrong was disciplined for paying pharmacist Amy Frazier for drive time and mileage to drive to her home store in Gulfport, Mississippi. Plaintiff knew, no later than October 14, 2008, that defendant's policy had changed, so that no pharmacists would thereafter be paid drive time and mileage to travel to their home stores. Id. Vol. II, at p. 10. The Final Written Warning that he received on April 1, 2009 advised Armstrong that any future disciplinary action against him could include

termination.  He acknowledged the Final Written Warning by signing it, and he wrote in the performance improvement action plan section of the Final Written Warning that he would not pay mileage to any associate for driving to a home store.  Defendant's Exh. A, Record Doc. No. 31-5 at p. 145, Exh. 71 to plaintiff's deposition.

Plaintiff now denies that he authorized the payment to Frazier or that she was under his supervision when she was paid for the drive time.  He asserts that Rogers knew that Frazier's store was no longer in his district at the time.  However, he did not tell Rogers those facts when he received the discipline, did not ask the appropriate district manager to tell Rogers that Frazier was no longer in plaintiff's district when she was paid for the drive time and did not contest the Final Written Warning in any way.  Defendant's Exh. A, plaintiff's deposition, Vol. III at pp. 72-83.

On May 21, 2009, Rogers received a complaint from a salaried staff pharmacist, Cynthia Calvert, who worked at a store in Morgan City, Louisiana under plaintiff's supervision.  Calvert complained that Armstrong had told her she would not be paid for all the time she had worked at another store.  Rogers asked Human Resources Manager Craig Domangue to investigate and to pay Calvert what she was owed.  Domangue's investigation revealed that plaintiff had told both Calvert and Pharmacy Manager Karl Schorr, who also worked at the Morgan City store, that he would not pay them for all hours they had worked.

Schorr provided Domangue with a written statement in which he declared that plaintiff had told him he would not be paid for five hours he had worked, and that his paycheck was actually short by six hours. Schorr stated that Armstrong had told him he would not be paid for all hours worked because his store had exceeded its budget. Calvert provided a written statement in which she also said that Armstrong had told her she would not be paid for all hours worked because her store had exceeded its budget. Her paycheck was short by three hours. Defendant's Exh. D, Record Doc. No. 31-8, declaration of Craig Domangue and attached statements and investigation results.

Plaintiff admits that he did not pay Schorr or Calvert for those hours and that he had told them that he would only pay what their store had budgeted because he wanted them to stay within their budget. Defendant's Exh. A, plaintiff's deposition, Vol. III at pp. 65, 67. However, he denies that the reason he gave them for not paying them in that particular instance was that their store was over budget. He testified that he told them that they would not be paid for their time spent getting ready for inventory and that they did not get pre-approval for the excess time. Id. Vol. III, at pp. 68, 93.

Armstrong testified that he was instructed "over and over again" by an unnamed "boss" that Rite Aid would not pay for time spent in inventory preparation or inventory, and that he should adjust the payroll hours of salaried pharmacists to delete any hours they had worked on inventory that exceeded their scheduled time. Id. Vol. III, at pp. 87-88, 96, 102. He testified that it was common practice among Pharmacy District

14

Managers not to pay salaried pharmacists for such time spent above their scheduled base time and that other Pharmacy District Managers adjusted the payroll records of their salaried pharmacists, just as he did in this case.  Id. Vol. III, at pp. 87, 102.  However, he also testified that the two pharmacists at the Morgan City store often went over budget on the hours that they worked and that he was trying to keep them within their budget when he deleted their hours.  Id. Vol. III, at pp. 128-29.

Rite Aid has two types of inventory: physical and controlled drug.  Rite Aid's policy is that a salaried Pharmacy Manager would not be paid for hours related solely to preparation for a physical inventory.  However, Rite Aid has no policy stating that a salaried Staff Pharmacist would not be paid for all hours worked doing any type of inventory.  Rite Aid also has no policy stating that a Pharmacy Manager would not be paid for all hours worked during a controlled drug inventory.  Rite Aid's policy is to pay any pharmacist who works extra hours on a controlled drug inventory day for those hours.

Defendant pays salaried pharmacists and pharmacy managers a premium hourly rate for all hours worked in excess of 84 hours in any bi-weekly period.  Armstrong knew of this policy, which went into effect on October 15, 2006 pursuant to a written memorandum.  Id. Vol. III, at pp. 58-60; Defendant's Exh. A, Record Doc. No. 31-5 at pp. 142-43, Exh. 70 to plaintiff's deposition.

Pursuant to this written policy, a pharmacist's monthly schedule is loaded into defendant's computerized timekeeping system, called Kronos. Pharmacists "punch" or clock in to the Kronos system when they arrive at the store to work. When a pharmacist exceeds his scheduled 84 hours, Kronos automatically adds the premium payment to his salary for the excess hours worked.

According to Rogers's declaration, pharmacists in her region should have been instructed not to work in excess of their store's hourly budget without prior approval. The proper response of a district manager to a pharmacist who worked more hours than the store's budget without pre-approval was to pay the pharmacist for the hours worked and then discipline him for his infraction. It is a violation of Rite Aid policy to refuse to pay a pharmacist for all hours worked, regardless of the store's budget.

After Domangue's investigation, Rogers and Domangue concluded that Armstrong had falsified payroll records in violation of that policy. Defendant's Exh. B, Record Doc. No. 31-6, Rogers declaration, at ¶¶ 18-29; Defendant's Exh. D, Record Doc. No. 31-8, Domangue declaration, at ¶¶ 8-14.

Domangue's investigation into Calvert's complaint revealed that Armstrong had twice logged on to Kronos and intentionally decreased the hours worked by Schorr and Calvert, resulting in decreased earnings payments to both. As altered by plaintiff, the Kronos time logs reflected that no pharmacist was in that store for a certain period of time, which would have meant that it was impossible for the pharmacy to be open.

16

Plaintiff knew that salaried pharmacists needed pre-approval to exceed their base hours.  He testified that he told salaried pharmacists he would not pay them if they worked excess hours on inventory preparation or inventory without pre-approval.  He also testified that, if pharmacists worked over their base hours in preparation for or on an inventory day, he was supposed to change those hours in the payroll system to match what they were scheduled to work that day.  Armstrong testified that "every [pharmacy] district manager" changed time entries in the Kronos system for salaried pharmacists who clocked in early, so that the pharmacists were only paid for their scheduled time.  He specifically named another Pharmacy District Manager, Calvin Magee, and Magee's assistant, Patricia Reyes, as persons who made such changes.  Defendant's Exh. A, plaintiff's deposition, Vol. III at pp. 62-64, 102, 124.

Plaintiff has submitted excerpts from Reyes's deposition testimony in support of his opposition to defendant's motion for summary judgment.  Her testimony is unclear in many respects.  She testified that she worked as a scheduler for Louisiana and Mississippi under Pharmacy District Manager Calvin Magee for four to five years through August 2009.  She stated that, in May 2009, no pharmacists were "paid over their base hours unless they worked outside into another area," meaning if they substituted for a pharmacist in another store.  Apparently referring to the "main store inventory" (as opposed to the controlled drug inventory), she testified that a pharmacist with an 80-hour base "would only get 80 hours whether he worked the inventory or he didn't work the

17

inventory."  Plaintiff's Exh. D, Record Doc. No. 57-7, Reyes deposition at p. 18.  She stated that a Pharmacist in Charge ("PIC") did not get paid for a drug inventory, but she understood that "the PIC got more money a[n] hour for that purpose only."  Id. at p. 20.

Reyes testified that, if a pharmacist was scheduled for a 12-hour shift, the Kronos system would automatically give him credit for 12 hours when he punched in.  Thus, if a PIC punched in at 6:00 a.m. for a drug inventory when he was scheduled to start at 9:00 a.m., Kronos recorded the time and automatically gave him 12 hours for the day.  Id. at p. 19.  Reyes said that the 6:00 a.m. punch could either remain in the records or be deleted.  She stated that she had changed hours in the Kronos records of a PIC when Magee asked her to do so, or when a particular pharmacist asked her to make corrections concerning his own time, such as when he had switched days with another pharmacist.  Id. at pp. 20, 24.  She testified that if a staff pharmacist punched in at 6:00 a.m. when he was scheduled to work from 9:00 a.m. to 9:00 p.m., the Kronos system would automatically "[g]ive him a one-hour-and-one-minute punch, and then the correction is made."  Id. at p. 21.  She stated that she had made corrections with respect to the "one-hour punch" when she was authorized to do so by her Pharmacy District Manager.

Reyes testified that she never discussed with Rogers or any manager other than her own Pharmacy District Manager the procedure of deleting punches by the PIC or staff pharmacists in connection with an inventory.  She did not know what Rogers knew about such procedures or whether Magee had Rogers's approval to delete hours worked by the

PIC or the staff pharmacists.  Id. at pp. 24, 26.  She stated that, as far as she knew, it was standard practice to correct a punch by the PIC or the staff pharmacists.  Id. at pp. 30-31.

During Domangue's investigation, Armstrong did not admit that he had intentionally altered the hours worked by Calvert and Schorr to decrease their pay.  He was given an opportunity to explain his actions in a letter dated June 11, 2009.  He stated that, on that particular day, he had rapidly entered information into the payroll system from 16 to 18 documents called "E forms," a form that he had never seen before, and that many of the "payroll punches" that the employees had given him were repetitive of information already in the system.  He stated that the E forms had caused "confusion" and would not be used anymore, and that all pharmacists who exceeded their base hours would now be required to punch in and out.  Defendant's Exh. A, Record Doc. No. 31-5 at p. 147, Exh. 72 to plaintiff's deposition.  Contrary to his deposition testimony that he had deducted Calvert's and Schorr's hours because they were related to inventory and Rite Aid's policy was not to pay salaried pharmacists for such inventory work, Defendant's Exh. A, plaintiff's deposition, Vol. III at pp. 95-97, Armstrong did not state in this contemporaneous letter that he had denied them the pay because their excess hours were related to inventory or because he had been instructed to do so by a higher level manager.

Plaintiff now admits that he intentionally altered Schorr's and Calvert's pay records.  Id. Vol. III at pp. 67, 92.  After investigating, Rite Aid paid both pharmacists for the hours they had worked that plaintiff had denied them.

Armstrong received his annual performance appraisal on June 8, 2009.  The appraisal reflected several deficiencies in the sales performance of the stores under his supervision.  As he had in the previous year, he received an overall rating of "needs development" from Rogers.

Based on the results of the investigation, including the evidence that Armstrong had deliberately changed the Kronos records of Calvert and Schorr to deny them pay for hours they had actually worked, and that he had denied doing so, Rogers and Domangue, in conjunction with Rite Aid's Human Resources department, decided to terminate plaintiff's employment.  He was fired on June 12, 2009 for payroll fraud.

Rogers has terminated two other Pharmacy District Managers, both white males, in the past three years for payroll fraud.  One of those managers, like Armstrong, had not paid a pharmacist for all hours worked.  Plaintiff cannot identify any Rite Aid employees who were found to have committed payroll fraud after an investigation and who were not subsequently terminated.  Id. Vol. III at p. 105.

C.     Plaintiff Cannot Rebut Defendant's Nonretaliatory Reasons for Discharge

Defendant raises several arguments in its motion for summary judgment, some of which have been mooted by plaintiff's abandonment of his racial and retaliatory harassment claims.  Plaintiff's only remaining claim is for retaliatory discharge.

Armstrong has the initial burden of proving a prima facie case of retaliation.  To establish a prima facie case, he "must show (1) that he engaged in a protected activity; (2) that an adverse employment action occurred; and (3) that a causal link existed between the protected activity and the adverse action."  Drake v. Nicholson, 324 F. App'x 328, 331 (5th Cir. 2009) (citing Holloway v. Dep't of Veterans Affairs, 309 F. App'x 816, 818 (5th Cir. 2009); LeMaire v. La., 480 F.3d 383, 388 (5th Cir. 2007)).  Rite Aid argues that plaintiff cannot show either that he engaged in an activity protected by Title VII or that a causal link existed between any protected activity and his termination.

> If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action.  The employer's burden is only one of production, not persuasion, and involves no credibility assessment.  If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose.  To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer.

McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2007) (citations omitted).

Plaintiff contends that he made several complaints to upper management, which constitute protected activity sufficient to meet the first prong of his prima facie case.  He

alleges in his opposition memorandum and supporting declaration under penalty of perjury that, in addition to his complaint during the May 14, 2008 meeting with Rogers and Ellison that two or three white pharmacists in Tuscaloosa had trouble working with an African-American manager, he made similar remarks to Rogers, Ellison, Grenier and Domangue on a few occasions between June 2008 and April 2009, when he was meeting with them for other reasons. Armstrong also alleges that he complained to Domangue and another manager on the day before he was fired that the two pharmacists in Morgan City did not want to work for an African-American manager. Neither plaintiff's extensive deposition testimony nor the voluminous other evidence in the record contains any evidence that these alleged oral complaints occurred. A party's self-serving and unsupported statement in an affidavit, which contradicts the party's deposition testimony, will not be considered. Avina v. JP Morgan Chase Bank, N.A., 413 F. App'x 764, 768 n.6 (5th Cir. 2011) (citing S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 496 (5th Cir. 1996)); Chambers v. Sears Roebuck & Co., No. 10-20360, 2011 WL 2392359, at *15 n.54 (5th Cir. June 15, 2011) (citing In re Hinsley, 201 F.3d 638, 643 (5th Cir. 2000); S.W.S. Erectors, Inc., 72 F.3d at 495-96).

It is doubtful that these alleged vague, isolated remarks, even if proven, amount to protected activity under Title VII. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 58 (2006); Fallon v. Potter, 277 F. App'x 422, 426 (5th Cir. 2008); Raby v. Westside Transit, 224 F. App'x 384, 385 (5th Cir. 2007) (citing Grimes v. Tex. Dep't of Mental

Health, 102 F.3d 137, 140 (5th Cir. 1996)); Marquez v. Voicestream Wireless Corp., 115 F. App'x 699, 702-03 (5th Cir. 2004).  However, I find it unnecessary to address whether these "complaints" constitute protected activity causally linked to plaintiff's termination. Even assuming without deciding that Armstrong could establish a prima facie case of retaliation, Rite Aid has met its burden of production by proffering legitimate non-retaliatory reasons for discharging him, and Armstrong has failed to establish a triable genuine issue of fact as to whether defendant's proffered reasons were false or pretextual.

Armstrong received a Final Written Warning on April 1, 2009 for paying pharmacist Frazier for time and mileage to drive to her home store, in violation of company policy.  Although he now claims that he neither authorized the payment to Frazier nor supervised her when the payment was made, Armstrong did not contest the Final Written Warning when it was given.  He was warned at that time that any subsequent disciplinary violation could lead to termination.   He also had poor performance evaluations in May 2008 and June 2009.

Despite the lack of any written Rite Aid policy to justify deleting the hours that Calvert and Schorr had actually worked, and in the face of contrary written policies about which he knew, Armstrong told Calvert and Schorr that he would not pay them for hours they had worked.  He altered their pay records in the Kronos system to make it appear that they had worked fewer hours, so that they were paid less.  After an internal investigation revealed that they had actually worked the deleted hours, Calvert and

Schorr were paid for those hours, regardless of the reason why they had worked. Plaintiff did not admit to his actions when Rite Aid asked him to explain them. These events, combined with his Final Written Warning status and poor performance evaluations for the past two years, constituted legitimate, nonretaliatory reasons for Rite Aid to fire him.

"Thus it falls to [plaintiff] to demonstrate that this reason is either 1) false, or 2) that the [employer] was motivated by retaliation in addition to" its legitimate reasons. Bell v. Bank of Am., 171 F. App'x 442, 444-45 (5th Cir. 2006). Armstrong "has failed to come forward with summary judgment evidence to create a genuine issue of material fact that Defendant's 'stated grounds for his termination were unworthy of credence.'" Cervantez v. KMGP Servs. Co., 349 F. App'x 4, 10 (5th Cir. 2009) (quoting Keelan v. Majesco Software, Inc., 407 F.3d 332, 345 (5th Cir. 2005) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000))).

Plaintiff now claims that he did not pay Calvert and Schorr because their hours were related to inventory and because Rite Aid had an unwritten policy that pharmacists were not paid for inventory-related hours in excess of their base scheduled hours. However, he never raised that explanation during Rite Aid's investigation. In Calvert's and Schorr's contemporaneous written statements, they said that he told them they would not be paid because they had exceeded their budget. Some of plaintiff's own testimony confirms that he had told them that he would only pay what their store had budgeted and that he was trying to keep them within their budget when he deleted their hours.

Armstrong names only two persons who participated in the supposedly common practice of deducting hours worked on inventory:  Magee, who was a Pharmacy District Manager like plaintiff, but whose testimony or sworn statement is not in the record; and Reyes.  According to her testimony, Reyes was in an inferior position to both Magee and Armstrong, took her instructions solely from Magee, did not know whether the practice of deleting hours had been approved by anyone in upper management, and had no knowledge of anyone else's practice.  Plaintiff has produced <u>no</u> evidence that Rogers or any other manager knew or approved of the allegedly common practice of deleting hours that salaried pharmacists had worked, contrary to the company's written policies.  In these circumstances, Armstrong has not created a genuine fact issue that an unwritten policy existed of deleting from the Kronos system pharmacists' hours related to inventory.

Armstrong testified vaguely that he was instructed by some unnamed boss at some unspecified time in his 10-year tenure with Rite Aid that the company would not pay for time spent working on inventory.  However, Armstrong knew that Rite Aid's written policy since October 2006 was to pay a salaried Staff Pharmacist for all hours worked doing any type of inventory, to pay any salaried pharmacist who worked extra hours on a controlled drug inventory day, and to pay salaried pharmacists a premium hourly rate for all hours worked in excess of 84 hours in any bi-weekly period.

When Rogers and Domangue decided to fire plaintiff, the information they had before them was that he had violated company policy by deliberately altering payroll hours worked by pharmacists under his supervision, had denied doing it, was in Final Written Warning status and had received two successive poor performance reviews. "[A]nti-discrimination laws are not vehicles for judicial second-guessing of business decisions." Mato v. Baldauf, 267 F.3d 444, 452 (5th Cir. 2001) (quoting Deines v. Tex. Dep't of Protective & Regulatory Servs., 164 F.3d 277, 281 (5th Cir. 1999)). "Whether an employer's decision was the correct one, or the fair one, or the best one is not a question within the jury's province to decide. The single issue for the trier of fact is whether the employer's [action] was motivated by discrimination" or retaliation. Bell, 171 F. App'x at 445 (quotation omitted). It is immaterial whether defendant's decision to terminate plaintiff may have been based on incorrect facts, so long as its decision was not motivated by retaliatory animus. Scales v. Slater, 181 F.3d 703, 711 (5th Cir. 1999).

The Fifth Circuit has "emphasize[d] . . . that a fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith." Cervantez v. KMGP Servs. Co., 349 F. App'x 4, 10 (5th Cir. 2009) (citing Waggoner v. City of Garland, 987 F.2d 1160, 21 1165 (5th Cir. 1993)). "Even if evidence suggests that a decision was wrong, [the court] will not substitute our judgment . . . for the employer's business judgment." Scott v. Univ.

26

of Miss., 148 F.3d 493, 509-10 (5th Cir. 1998), abrogated on other grounds by Kimel v.

Fla. Bd. of Regents, 528 U.S. 62, 72 (2000) (citation omitted).

Armstrong has failed to offer evidence sufficient to create a triable factual issue

that Rite Aid had an unwritten practice of not paying pharmacists for all hours worked.

Moreover, even if such a practice existed among a few Pharmacy District Managers, he

has produced no evidence that plaintiff's superiors knew of the practice or that Rite Aid

selectively enforced its written policy against him as a pretext for retaliation.  It is

undisputed that Rogers terminated another Pharmacy District Managers for payroll fraud

when he had not paid a pharmacist for all hours worked.  Plaintiff cannot identify any

Rite Aid employees who were found to have committed payroll fraud after an

investigation and who were not subsequently terminated.

Armstrong has failed to raise a genuine dispute of material fact regarding Rite

Aid's legitimate, non-retaliatory reasons for terminating his employment.  Accordingly,

defendants are entitled to summary judgment in their favor as a matter of law.

CONCLUSION

For all of the foregoing reasons, **IT IS ORDERED** that defendants' motion for

summary judgment is GRANTED and that plaintiff's claims are DISMISSED WITH

PREJUDICE.

Judgment will be entered accordingly, plaintiff to bear all costs of this proceeding.

Fed. R. Civ. P. 54(d)(1).

New Orleans, Louisiana, this _____14th_____ day of July, 2011.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE